## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 06-21182-CIV-ALTONAGA/Turnoff

**HOLLEY RAUEN** and **NIKKI
HARTMAN**,

       Plaintiffs,

vs.

**CITY OF MIAMI,** et al.,

       Defendants.

_____/

### ORDER ON MOTIONS TO DISMISS

**THIS CAUSE** came before the Court on Defendants, Broward Sheriff's Office ("the BSO")

and John Brooks' Motion to Dismiss Third Amended Complaint **[D.E. 60]**, filed on November 20,

2006; Defendant, City of Miami's ("Miami['s]") Motion to Dismiss Third Amended Complaint **[D.E.

74]**, filed on December 14, 2006; Defendants, John Timoney, Frank Fernandez, Adam Burden, and

Thomas Cannon's (the "Miami Police Supervisors[']") Motion to Dismiss Third Amended Complaint

**[D.E. 75]**, filed on December 14, 2006, and Supplement to Miami Police Supervisors' Motion to

Dismiss Third Amended Complaint **[D.E. 76]**, filed on December 15, 2006; Defendants, City of Fort

Lauderdale ("Fort Lauderdale") and Lee Spector's Motion to Dismiss Plaintiffs' Third Amended

Complaint **[D.E. 80]**, filed on December 26, 2006; Defendant, City of Miami Beach's ("Miami

Beach['s]") Motion to Dismiss Plaintiffs' Third Amended Complaint **[D.E. 93]**, filed on January 12,

2007; and Defendant, Ed Yero's Motion to Dismiss Plaintiffs' Third Amended Complaint **[D.E. 94]**,

filed on January 12, 2007.

In their Motions to Dismiss, Defendants challenge the claims asserted in Plaintiffs' Third

Amended Complaint (the "TAC") [D.E. 58, Exh. A], asserting that each claim should be dismissed

CASE NO. 06-21182-CIV-ALTONAGA/Turnoff

under Federal Rule of Civil Procedure 12(b)(6).  The Court has carefully considered the parties'

written submissions, the arguments made at the February 12, 2007 hearing on the motions, and

applicable law.

## I.  BACKGROUND[1]

This action arose from the events surrounding the Free Trade of the Americas ("FTAA")

ministerial hearings, which took place in Miami, Florida in November 2003.  Plaintiffs, Holly Rauen

("Rauen") and Nikki Hartman ("Hartman"), contend that a concerted effort by all Defendants to

unlawfully limit protest at the FTAA resulted in multiple violations of Plaintiffs' constitutional rights

by various law enforcement agencies and their officers.  Plaintiffs also assert state common law tort

claims for battery and negligence against the various law enforcement agencies.

### *The Joint Operational Security Plan*

Plaintiffs allege that in preparation for the anticipated FTAA protests, multiple law

enforcement agencies submitted "to a single plan and a single command," the "operational security

plan," pursuant to which Defendants, Miami and Miami's Chief of Police, John Timoney, assumed

a "primary leadership role." (*TAC* ¶ 24).  The "command structure" for the FTAA allegedly consisted

of two separate, but integrated, elements: the Miami Police Department Steering Committee and the

Joint Law Enforcement Command ("JLEC").  (*See id.*).  The JLEC was comprised of the heads of

the agencies, or their delegated representatives, who were assigned "a major role or specific function

for the security of the FTAA Ministerial."  (*Id.*).  Each of the Municipal Defendants'[2] law

---

[1] The background facts are taken from the TAC and are accepted as true for purposes of this Rule 12(b)(6) analysis.

[2] The term "Municipal Defendants" is used throughout this Order to refer to Defendants Miami, Miami Beach, Fort Lauderdale, and BSO.

CASE NO. 06-21182-CIV-ALTONAGA/Turnoff

enforcement agencies was a member of the JLEC.  (*See id.* ¶¶ 8-11).

Plaintiffs allege that each of the agencies that was part of the JLEC was instrumental in devising the policies that allegedly resulted in violations of Plaintiffs' constitutional rights and that those agencies, in essence, acted as a single entity, particularly in their agreed-upon use of force and arrest protocols.  (*See id.* ¶¶ 8, 24).  Through the implementation of the joint operational security plan, Plaintiffs allege, Defendants intentionally disrupted core political speech and other expressive activity "through the wrongful 'herding' of unarmed, peaceful demonstrators, and the systemic use of para-military tactics and offensive weapons."  (*Id.* ¶ 1).  Plaintiffs allege that Defendants' activities resulted in egregious violations of their First and Fourth Amendment rights and that the implementation of the joint operational security plan resulted in a "*de facto* suspension of constitutional rights in Miami" during the FTAA meetings.  (*Id.* ¶ 1).

Although the TAC alleges that the entire operational plan was unlawful, it primarily focuses upon the activities surrounding the "herding" of protestors and the unprovoked attack by law enforcement officers upon peaceful protestors on Biscayne Boulevard and near the Bayfront Amphitheater on November 20, 2003.  Specifically, Plaintiffs allege that they were subjected to "herding," "political profiling," and unreasonable force, in violation of the First and Fourth Amendments, all without individualized suspicion.  (*Id.* ¶ 20).

### *Plaintiffs' Activities*

On November 20, 2003, Plaintiffs, Rauen and Hartman, participated in a peaceful demonstration relating to the FTAA meetings.  (*See id.* ¶¶ 6-7).  During the late afternoon, Rauen was standing peacefully on the grass near the Bayfront Amphitheater.  (*See id.* ¶ 7).  Some of the protestors began chanting near a line of police.  (*See id.* ¶ 31).  Approximately ten minutes later,

police informed the group that they could remain assembled there so long as the group remained peaceful, but within approximately one minute, officers began opening fire on the protestors with rubber bullets, pepper-spray, and other weapons. (*See id.* ¶ 32). At this point, officers from the Miami Police Department, Miami Beach Police Department, Fort Lauderdale Police Department, and the BSO began marching, shoulder-to-shoulder, northbound on Biscayne Boulevard, continuing to fire rubber bullets, pepper-spray beanbags, shotgun-based projectiles (collectively, "less lethal weapons"), pepper spray, tear gas, and other weapons at the protestors. (*See id.* ¶¶ 33, 43). Plaintiffs allege that each of the Individual Defendants was either on or directly behind this police "skirmish line" and that each of them was acting in a supervisory capacity at the time. (*See id.* ¶ 34).

Rauen was caught behind the police line and was shot from point-blank range with shotgun-based projectiles and rubber bullets. (*See id.* ¶¶ 34, 36, 43). She was seriously injured after being shot in the chest. (*See id.*). Rauen fled eastward toward the Amphitheater to escape the oncoming police line. (*See id.* ¶ 43). The police assault upon Rauen was captured on a videotape that is incorporated by reference in the TAC. [D.E. 37, videotape A-2].

Also during the late afternoon, Hartman was engaged in a prayer vigil on the east side of Biscayne Boulevard. (*See TAC* ¶ 6). As the police line moved forward, it approached Hartman, who was praying in the lotus position. (*See id.* ¶ 43). Hartman was shot multiple times with less lethal weapons in the head, back, and legs, and was seriously injured by a shot to the head. (*See id.* ¶¶ 34, 36, 43). Hartman fled northward to escape the oncoming police line. (*See id.* ¶ 43). The police assault upon Hartman was also captured on a videotape that is incorporated by reference in the TAC. [D.E. 37, videotape A-3].

CASE NO. 06-21182-CIV-ALTONAGA/Turnoff

***Alleged Constitutional Violations***

Plaintiffs allege that Defendants engaged in "herding," forming a skirmish line and forcing protestors in a specific direction through advancement and through the use of "intensely excessive force." (*TAC* ¶ 40). This skirmish line was formed to the south of the protestors, and the areas north, west, and east of the protestors were blocked by police. (*See id.* ¶ 41). Through this strategy, Plaintiffs allege, Defendants intended to restrain without justification Plaintiffs' freedom of movement. (*See id.* ¶ 40). Plaintiffs allege that Defendants' activities resulted in First Amendment violations through the suppression of protected expressive activity, and Fourth Amendment violations through both the seizure of protestors without individualized suspicion and the use of excessive force without justification during those seizures. (*See, e.g., id.* ¶¶ 40, 55).

Each of the Defendants' motions focuses largely on the TAC's specific allegations against each Defendant. Those allegations are discussed in the analysis sections specific to each Defendant.

## II. <u>ANALYSIS</u>

### A.    **Legal Standard**

"Dismissal is appropriate where it is clear the plaintiff can prove no set of facts in support of the claims in the complaint. Accordingly, the court may dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Marshall County Bd. of Educ. v. Marshall County Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993) (citations omitted). "In ruling on the motion to dismiss the district court must accept the well pleaded facts as true and resolve them in the light most favorable to the plaintiff." *St. Joseph's Hosp., Inc. v. Hosp. Corp. of America*, 795 F.2d 948, 954 (11th Cir. 1986). "When the allegations contained in a complaint are wholly conclusory,

5

however, and fail to set forth facts which, if proved, would warrant the relief sought, it is proper to dismiss for failure to state a claim." *Davidson v. Georgia*, 622 F.2d 895, 897 (11th Cir. 1980).

"In ruling on a motion to dismiss, the Court is constrained to review the allegations as contained within the four corners of the complaint and may not consider matters outside the pleading without converting the defendant's motion into one for summary judgment." *Crowell v. Morgan Stanley Dean Witter Services, Co.*, 87 F. Supp. 2d 1287, 1290 (S.D. Fla. 2000); *see also Milburn v. United States*, 734 F.2d 762, 765 (11th Cir. 1984) ("Consideration of matters beyond the complaint is improper in the context of a motion to dismiss . . . . [T]he court converts a motion to dismiss into a motion for summary judgment by considering matters beyond the complaint."). In evaluating a motion to dismiss, however, a court may also consider any exhibits to the complaint. *See Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000).

### B.    Failure to Allege Identities of Individual Officers[3]

Defendants challenge a number of Plaintiffs' claims on the basis that Plaintiffs are unable to identify the specific officers who inflicted their injuries and, thus, are unable to allege that the actions of any particular Individual Defendant resulted in Plaintiffs' injuries or that any particular Municipal Defendant should be held liable for Plaintiffs' injuries. (*See, e.g., BSO Mot.* [D.E. 60] at 3). In response, Plaintiffs assert that they have stated claims against each of the Defendants by alleging that the Defendants were joint tortfeasors who all contributed to Plaintiffs' injuries and are therefore all liable for those damages. (*See Resp. to BSO Mot.* [D.E. 96] at 4-5).

Plaintiffs asserted in oral argument, and alleged in the TAC, that the officers involved in the

---

[3] Throughout this Order, the Court addresses each argument pertaining to the dismissal of a particular type of claim without regard to whether the argument was raised by a particular Defendant. Insofar as identical issues pertain to multiple Defendants, Plaintiffs have had ample opportunity to respond to each argument.

events giving rise to Plaintiffs' claims dressed in identical riot gear uniforms with the word "police" on them, covered their faces with face shields, and failed to identify any agency or personal identification on their uniforms. (*See TAC* at ¶ 39). This can be seen in the videotape incorporated in the TAC. Because of the Defendants' decision to conceal their identities by wearing identical uniforms lacking identification, Plaintiffs are unable to identify the specific officers who inflicted their injuries or the police force(s) of which those officers were members.

Accepting Defendants' argument that Plaintiffs have failed to state a claim against any of the Defendants because of Plaintiffs' inability to identify specific officers would require the Court to dismiss Plaintiffs' case in its entirety. Such a result is clearly not in the interests of justice, for it would reward Defendants for their uniform method of dress at the FTAA, which makes it virtually impossible for an observer to identify the officers or departments behind each face shield. The undersigned therefore finds that Plaintiffs' inability to identify the specific officers involved in their alleged deprivation of rights does not mandate dismissal of any of the claims under Federal Rule 12(b)(6), particularly where Plaintiffs have named as Defendants only those entities and individuals who were present at the skirmish line where Plaintiffs were injured.[4] Of course, as discovery progresses, the parties may identify information that would support the dismissal of (or entry of summary judgment on) claims against particular Defendants.

**C. Existence of Fourth Amendment "Seizure"**

The TAC contains eleven counts predicated upon what Plaintiffs assert were actions by the

---

[4] Plaintiffs have not, for example, named the Hialeah Police Department, which participated in policing the FTAA meetings, as a defendant in this action because Plaintiffs have learned, presumably through the review of documents, that Hialeah Police Department officers were not present at the skirmish line.

CASE NO. 06-21182-CIV-ALTONAGA/Turnoff

Defendants that constituted "herding" of the Plaintiffs and the use of force and excessive force in violation of the Fourth Amendment's proscription against unreasonable seizure.  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ."  U.S. Const. amend. IV.  The eleven counts are grouped into four categories: *Monell* liability against the Municipal Defendants, supervisory liability against specific Individual Defendants for directing acts that resulted in alleged violations of the Fourth Amendment, supervisory liability against specific Individual Defendants for failure to intervene to prevent alleged violations of the Fourth Amendment, and conspiracy by the Municipal Defendants to violate Plaintiffs' Fourth Amendment rights.  The counts are more particularly described as follows:

(1) *Monell* liability: Count Three alleges a *Monell* claim against Miami pursuant to 42 U.S.C. § 1983 ("section 1983") for violations of the Fourth Amendment resulting from official policies sanctioning unlawful seizures; Count Four alleges a *Monell* claim against Miami pursuant to section 1983 for violations of the Fourth Amendment resulting from the final policymaker's alleged policy of allowing unlawful seizures and the use of excessive force; and Count Six alleges a *Monell* claim against Miami Beach, Fort Lauderdale  and the BSO pursuant to section 1983 for violations of the Fourth Amendment resulting from official policies sanctioning unlawful seizures.

(2) Supervisory Liability: Count Eight alleges a claim against Timoney, Count Ten alleges a claim against Fernandez, Count Twelve alleges a claim against Cannon, and Count Fourteen alleges a claim against Yero, Brooks, and Spector under section 1983 for directing unlawful acts that resulted in the violation of Plaintiffs' Fourth Amendment rights to be free from unreasonable seizure or force or excessive force in effecting the unreasonable seizure.

(3) Failure to Intervene: Count Sixteen alleges a claim against Timoney and Burden, Count Eighteen alleges a claim against Fernandez and Cannon, and Count Twenty alleges a claim against Yero, Brooks, and Spector under section 1983 for failing to intervene to prevent the deprivation of Plaintiffs' Fourth Amendment rights to be free from unreasonable seizure or force or excessive force in effecting the unreasonable seizure.

(4) Conspiracy: Count Twenty-Two alleges a claim against Miami, Miami Beach, Fort Lauderdale, and the BSO under section 1983 for conspiracy to violate Plaintiffs' Fourth Amendment rights to be free from unreasonable seizure or force or excessive force in effecting the unreasonable seizure.

Miami, the BSO, Miami Beach, and Fort Lauderdale, *via* the BSO's Motion to Dismiss, argue that the Third Amended Complaint fails to state a claim for a violation of the Fourth Amendment because (1) the allegations of "herding" are insufficient to establish a seizure, and (2) no case law from the Supreme Court or the Eleventh Circuit holds that effectuating a dispersal order through the use of less lethal weapons constitutes a seizure. (*See BSO Mot.* at 4). The Municipal Defendants maintain that in order for there to be a seizure, the use of force must be for the purpose of apprehending and stopping a person, a fact that is not alleged here. (*See id.* at 6). Furthermore, Defendants contend that the use of less lethal weapons to disperse a crowd of demonstrators does not constitute a Fourth Amendment seizure. (*See id.* at 7). Defendants maintain that *California v. Hodari D.*, 499 U.S. 621 (1991), compels this result, that Plaintiffs' reliance on unpublished trial court decisions is misplaced, and that those unreported decisions represent an unjustified extension of the concept of "seizure" that the Court should reject. (*See id.*).

Plaintiffs insist that because this case presents restrictions on First Amendment-protected

assembly, Fourth Amendment protections should be applied with "scrupulous exactitude." *Citing Lamb v. City of Decatur*, 947 F. Supp. 1261, 1263 (C.D. Ill. 1996) (labor demonstration where demonstrators were pepper sprayed by law enforcement officers) (*See Resp. to BSO Mot.* at 6). Plaintiffs argue that seizures may occur through the use of physical force, and cite to the unreported decisions of *Marbet v. City of Portland*, Case No. CV 02-1448-HA, 2003 WL 23540258 (D. Or. Sept. 8, 2003), and *Coles v. City of Oakland*, Case No. C03-2962 TEH (N.D. Cal., Apr. 27, 2005), in which the courts found seizures within the meaning of the Fourth Amendment based on allegations that the plaintiffs, participants in protest activities, had been shot with pepper spray and rubber pellets (in *Marbet*), and had had force applied to them in the form of wooden bullets, bean bags, grenades, batons, and motorcycle hits (in *Coles*). Plaintiffs also rely upon *Hodari D.*, asserting that that case held that a seizure occurs where there is a submission to a show of governmental authority, which is what Plaintiffs allege by describing "herding" and encirclement in the TAC.

*Hodari D.*, as noted by Plaintiffs, involved a juvenile criminal suspect seeking to avoid apprehension who fled when a police cruiser approached, dropping drugs as he fled, and who was not apprehended until he was tackled by police. 499 U.S. at 622-23. At issue was whether, at the time the juvenile dropped the drugs, he had already been "seized" within the meaning of the Fourth Amendment. *Id.* at 623. Writing for the majority, Justice Scalia found that no seizure had taken place until the juvenile was tackled by police. *See id.* at 629. In explaining what constitutes a seizure under the Fourth Amendment, Justice Scalia wrote:

> The word "seizure" readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful. . . . It does not remotely apply, however, to the prospect of a policeman yelling "Stop, in the name of the law!" at a fleeing form that continues to flee. That is no seizure. . . . An arrest requires *either* physical force (as described above) *or*, where that is absent, *submission* to the assertion of authority.

*Id.* at 626 (emphasis in original).

In *Marbet*, plaintiffs, who were present in front of the Hilton Hotel in downtown Portland, Oregon, were protesting the policies of the Bush Administration and police used pepper spray and rubber bullets to move the protestors with force. 2003 WL 23540259, at *1. In considering the argument, made on a motion to dismiss, that such actions did not constitute a seizure under the Fourth Amendment, the court, in discussing *County of Sacramento v. Lewis*, 523 U.S. 823 (1998), observed that "a seizure occurs from the 'governmental termination of freedom of movement through means intentionally applied.' *Id.* (citing *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1987))." Turning to the sufficiency of the allegations pleaded, the court noted that

> [t]he Amended Complaint alleges facts, which, if proved, would establish that defendants intentionally restrained plaintiffs' freedom of movement. Plaintiffs allege that defendants intentionally applied pepper spray and shot rubber bullets at plaintiffs who were engaged in lawful protest activities. Further, the protesters were physically moved back from their peaceful positions, according to the Amended Complaint.

> \*          \*          \*

> Clearly, the effect of defendants' actions was to control plaintiffs' movement. Additionally, certain plaintiffs assert that they were physically prevented from leaving an area cordoned off by the police. By physically moving certain plaintiffs and circumscribing the area of movement of other plaintiffs, defendants seized plaintiffs within the meaning of the Fourth Amendment.

*Id.* *9-10.

In *Coles*, plaintiffs were at an anti-war demonstration and alleged that Oakland police officers used excessive force without warning, firing projectiles, including wooden dowels, using, often at close range, "flexible batons" or bean bags, clubs, and sting ball grenades filled with rubber pellets and tear gas, and charging plaintiffs with motorcycles. *See* No. C03-2962 TEH at 2. The allegations stated that police herded plaintiffs from the port area to a station more than a mile away. *See id.* The

court addressed whether plaintiffs had sufficiently alleged an "other seizure" sufficient to trigger Fourth Amendment protections. *See id.* at 4 (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("other seizure" to trigger the Fourth Amendment and its "reasonableness" standard) and *County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) (where there is no search or seizure, use of force is unconstitutional only if it "shocks the conscience" under the Fourteenth Amendment)).

In its review of applicable law, the court in *Coles* found persuasive the statement in *Brower*, 489 U.S. at 596-97, that a Fourth Amendment seizure occurs "only when there is a governmental termination of freedom of movement through means intentionally applied." In agreeing with the analysis employed by the court in *Marbet*, and consistent with the *Brower* definition of a seizure, the court in *Coles* found that defendants had allegedly terminated plaintiffs' freedom of movement through means intentionally applied. *See* No. C03-2962 TEH at 10-11. It was not fatal to the sufficiency of the Fourth Amendment claims that plaintiffs were not rendered completely immobile or forced to remain in one location; what was required was that a person's freedom of movement had been terminated, not that the person's movement itself had been terminated. *See id.* at 8.

*Marbet* and *Coles* present factual scenarios virtually indistinguishable from the allegations asserted by Plaintiffs here. The TAC alleges that Defendants employed a tactic of "herding" in which they created a large "encirclement perimeter" and used hundreds of heavily-armed, riot gear-clad officers in SWAT units and FTAA-specific "field forces" in a skirmish line to force demonstrators in a desired direction through use of intensely excessive force. (*See TAC* ¶ 40). During the course of Defendants' activities, Hartman was allegedly engaged in a prayer vigil on the lawn on the east side of Biscayne Boulevard and was shot without reason on multiple occasions by law enforcement officers. (*See id.* ¶ 6). Rauen was allegedly standing peacefully on the grass near the Bayfront

Amphitheater when she was shot without reason by officers.  (*See id.* ¶7).

The encirclement perimeter consisted of the following: on the southern boundary, the skirmish line formed from Biscayne Bay on the east to the buildings on Biscayne Boulevard on the west side, with a huge FTAA-specific security fence surrounding the Intercontinental Hotel to the rear of the skirmish line.  (*See id.* ¶ 41).  The eastern boundary was Biscayne Bay near the Intercontinental Hotel, a little north of that the Bayfront Amphitheater was the eastern boundary, and north of the Amphitheater, several armored personnel carriers and the Hialeah Police Department field force blocked off access to Bayside and the port area to the east.  (*See id.*).  The western boundary of this encirclement perimeter was a line of riot police and bicycle response platoons blocking movement.  (*See id.*).  Finally, the northern boundary consisted of the Miami-Dade County Police Department blocking movement.  (*See id.*).

In the process of herding the demonstrators, the officers used batons to beat them and sprayed pepper spray up and down the lines, while using bean bags, pepper spray balls, OC spray rounds, and tear gas.  (*See id.* ¶ 43).  Hartman, who was praying while seated in the lotus position on the grass, was shot in the head, back and legs on multiple occasions.  (*See id.*).  Hartman submitted to the show of authority after being shot by moving northbound in an effort to retreat from the oncoming skirmish line.  (*See id.*).  An officer shot Rauen in the chest at close range with a projectile.  (*See id*).  She, too, submitted to Defendants' show of authority by moving eastbound, closer to the Amphitheater, as police began shooting demonstrators and discharging chemical weapons.  (*See id.*).

It can hardly be disputed that the TAC sufficiently alleges that Plaintiffs' freedom of movement was terminated by the deliberate use of force and skirmish lines to herd and then encircle Plaintiffs in an area in which they otherwise would not have been.  Construing the allegations in the

light most favorable to Plaintiffs, the undersigned finds that Plaintiffs have sufficiently alleged an unreasonable seizure within the meaning of the Fourth Amendment.

### D.   *Monell* Liability

The Court next turns to a consideration of whether Plaintiffs sufficiently state a claim in Counts One through Six of the TAC under *Monell v. Dep't of Social Serv. of City of New York*, 436 U.S. 658 (1978), and its progeny, specifically *Board of County Commissioners v. Brown*, 520 U.S. 397 (1997). The Municipal Defendants maintain that no municipal "policy" or "custom" has been identified that caused Plaintiffs' alleged deprivation of constitutional rights. Furthermore, Defendants argue that the TAC does not sufficiently allege culpability and a causational link between the municipal action and Plaintiffs' deprivation of federal rights.

Count One alleges a *Monell* claim under section 1983 for violations of the First Amendment resulting from official policies adopted by Miami to suppress protected speech and assembly. The basis of the claim is Miami's adoption of an unconstitutional ordinance, on the eve of the FTAA Ministerial Meeting, to limit First Amendment-protected speech and assembly; adoption of the joint operational security plan encompassing more than 40 law enforcement agencies; and adoption of unwritten components of the plan, the purpose of which was to severely limit opportunities for First Amendment-protected core political speech and assembly. (*See TAC* ¶¶ 51-52). Count Two alleges the same claim against Miami, but is based on the actions of Timoney, as the final policymaker and person responsible for implementation of agreements with other agencies, to deprive Plaintiffs and others of their First Amendment rights. (*See id.* ¶ 56).

Count Five alleges a *Monell* claim against Miami Beach, Fort Lauderdale and the BSO under section 1983 for violations of the First Amendment resulting from official policies to suppress

protected speech and assembly.  The TAC alleges that these Defendants' final policymakers entered into "Mutual Aid Agreements," the "joint operational security plan," and the JLEC, and were a part of the unwritten purpose of the plan to severely limit First Amendment-protected core speech and assembly during the FTAA Ministerial Meetings.  (*See id.* ¶ 71).  Plaintiffs allege that adoption of these agreements and plans proximately caused the deprivation of Plaintiffs' First Amendment rights. (*See id.* ¶ 72).

In Counts Three, Four and Six, which, again, are premised upon alleged violations of the Fourth Amendment, Plaintiffs allege that the Municipal Defendants adopted policies, including the "joint operational security plan," and entered into an unwritten agreement, the purpose of which was

> to severely limit opportunities for First Amendment-protected core political speech and assembly during the FTAA Ministerial Meetings by encouraging Fourth Amendment violations, specifically seizure through excessive force by the use of "less lethal" weapons without any individualized probable cause, and seizure through herding techniques.

(*Id.* ¶¶ 62, 66, 76).  Plaintiffs allege that the final policy of Miami is evidenced by the adoption of an unconstitutional ordinance to limit "First Amendment-protected speech and assembly, and to provide a pretext for law enforcement agencies to disrupt peaceful, lawful political assemblies in November 2003."  (*Id.* ¶ 60).  Other evidence of final policy-making by Miami is the establishment of the JLEC and "'joint operational security plan' . . . encompassing more than 40 law enforcement agencies. . . and the adoption of the unwritten components of the plan, which included political and ideological profiling, harassment and herding of protestors." (*Id.* ¶ 66).

As to the remaining Municipal Defendants, Count Six alleges that final policy-making is evidenced by the adoption of the joint operational security plan and entry into the JLEC, in which all agencies were given a participatory role in the decision-making process of the FTAA security plan,

and "consent" by the Municipal Defendants to the unwritten purpose of the plan to severely limit opportunities for First Amendment-protected core political speech and assembly by seizure through excessive force and herding without individualized probable cause.  (*See id.* ¶ 76).  Furthermore, Miami and the other Municipal Defendants adopted mutual aid agreements that also served to proximately cause the Fourth Amendment deprivations.  (*See id.* ¶ 78).

Under 42 U.S.C. § 1983, municipalities may not be held liable under theories of vicarious liability or respondeat superior.  *See Monell*, 436 U.S. at 707.  Indeed, "[a] county is liable under section 1983 only for acts for which [the county] is actually responsible."  *Grech v. Clayton County, Ga.*, 335 F.3d 1326, 1330 (11th Cir. 2003) (*en banc*) (quoting *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1027 (11th Cir. 2001) (*en banc*) (internal quotations omitted)).  However, a municipality may be sued under section 1983 if "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Monell*, 436 U.S. at 690.  Defendants argue that because Plaintiffs have failed to allege a direct causal link between the municipal action and deprivation of federal rights, and other than the passage of an "unconstitutional" Miami ordinance, have failed to allege an official policy or widespread practice or custom,[5] the Municipal Defendants cannot be held liable under section 1983.

The limitations placed upon municipal liability by *Monell* and its progeny are primarily concerned with responsibility.  Courts interpreting section 1983 have repeatedly held that a

---

[5] This Order does not address Defendants' arguments that the TAC does not plead a cause of action based upon the existence of a custom maintained by Defendants.  Actions taken during a single-time event, such as the FTAA Ministerial Meeting, do not rise to the level of a custom.

municipality should not be held liable for actions over which it has no control.  *See Grech*, 335 F.3d at 1343; *see also Monell*, 436 U.S. at 694 ("[I]t is when execution of a [county's] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury that the [county] as an entity is responsible under § 1983.").  An "official policy often refers to formal rules or understandings - often but not always committed to writing - that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986).

"A policy is officially sanctioned where it is adopted by the official responsible under state law for making policy in that area of the government's business."  *Green v. Miami-Dade County*, No. 02-Civ-22996, 2003 WL 22331877, at *12 (S.D. Fla. Sept. 9, 2003) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 125 (1988); *Pembaur*, 475 U.S. at 481-83)).  "Final policymaking authority over a particular subject area does not vest in an official whose decisions in the area are subject to meaningful administrative review."  *Scala v. City of Winter Park*, 116 F.3d 1396, 1401 (11th Cir. 1997).  The identification of the final policymaking authority is a matter of state law to be determined by the Court.  *See Praprotnik*, 485 U.S. at 124-25.

The TAC clearly alleges that the Municipal Defendants developed, and submitted to, several plans and agreements, the purpose of which was to stifle protest at the FTAA.  It is not material that part of this policy or plan was unwritten.  Moreover, the TAC asserts that the allegedly unconstitutional acts of the officers were taken in accordance with the unwritten and written plans and agreements.

Rule 8(a), Fed. R. Civ. P., provides:

> A pleading which sets forth a claim for relief . . . shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends, unless the court already has jurisdiction and the claim needs no new grounds of jurisdiction to support it, (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks.

The TAC comports with Rule 8(a).

The Supreme Court has addressed, and soundly rejected, the argument that a plaintiff must meet a heightened pleading requirement in section 1983 suits prosecuted against municipalities. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1993). The Court noted that even in section 1983 cases brought against municipalities,

> [t]he Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

*Id.* at 168 (quoting *Conley v. Gibson*, 355 U.S. 41 (1957)).

Although the Court recognized the burdens that municipalities face in defending against section 1983 actions, it held that amending the Federal Rules is the province of Congress, not the judiciary. *Id.* at 168-69. The Eleventh Circuit has explicitly recognized that to the extent that prior cases within the Circuit imposed a heightened pleading requirement in section 1983 cases against municipalities, they were overruled by *Leatherman*. *See Swann v. Southern Health Partners, Inc.*, 388 F.3d 834, 837-38 (11th Cir. 2004).

Defendants' reliance on *Kesser v. City of Miami*, Case No. 04-22608-Civ-Jordan, (*see BSO Mot.* at 8-9), is misplaced, as there, no city policy, custom or practice had been identified after discovery, and summary judgment was granted on the section 1983 claim. The Federal Rules of Civil

Procedure require that Plaintiffs be given the opportunity, through discovery, to determine whether officials with ultimate decision-making responsibility instituted the alleged policies in question, and be permitted to show the requisite causal link between the alleged municipal actions/plans agreed to and the deprivation of federal constitutional rights. Accordingly, Counts One through Six are found to state a claim under section 1983.

### E.    Plaintiffs' Conspiracy Claims

In Counts Twenty-One and Twenty-Two of the TAC, Plaintiffs assert claims against the Municipal Defendants under section 1983 for conspiracy to violate Plaintiffs' First Amendment and Fourth Amendment rights, respectively. Defendants challenge these claims on the bases that: (1) the claims are inadequately pleaded because civil rights conspiracy claims must be pleaded with particularity; (2) the claims fail to set forth sufficient facts to support the allegation that the Municipal Defendants entered into an "agreement" to violate Plaintiffs' civil rights; and (3) Plaintiffs have failed to allege any underlying denial of constitutional rights, which is required to state a claim for civil rights conspiracy. The undersigned addresses these arguments in turn.

#### 1.    *Applicable Pleading Standard*

There is no heightened pleading standard for civil rights conspiracy claims against municipalities. *See Swann*, 388 F.3d at 837. Thus, the notice pleading standard provided for in Federal Rule of Civil Procedure 8(a) also applies to Plaintiffs' conspiracy claims.

#### 2.    *Sufficiency of Allegations Under Rule 8(a)*

Defendants assert that Plaintiffs' conspiracy claims fail to adequately state claims for relief even under the liberal notice pleading standard of Rule 8(a). In order to state a claim for civil conspiracy, Plaintiffs must allege "an agreement between two or more people to achieve an illegal

objective, an overt act in furtherance of that illegal objective, and a resulting injury to the plaintiff."
*Bivens Gardens Office Bldg. v. Barnett Banks, Inc.*, 140 F.3d 898, 912 (11th Cir. 1998). "A plaintiff
claiming a conspiracy under § 1983 must make particularized allegations that a conspiracy exists. .
. . Vague and conclusory allegations suggesting a § 1983 conspiracy are insufficient to withstand a
motion to dismiss." *Hansel v. All Gone Towing, Inc.*, 132 Fed. Appx. 308, 309 (11th Cir. 2005)
(internal citations omitted).

In Count Twenty-One, Plaintiffs allege that the Municipal Defendants had an "unwritten
agreement to suppress dissent at the FTAA through a show of overwhelming force, thereby violating
the First Amendment rights of speech, assembly, and association of Plaintiffs and other
demonstrators." (*TAC* ¶ 166). Plaintiffs further allege that this "unwritten agreement" was entered
into in the course of the "months of planning leading up to the FTAA, including the mutual aid
agreements and the Joint Law Enforcement Command." (*Id.*). Plaintiffs also assert that the
Municipal Defendants implemented their plan through the formation, on November 20, 2003, of
police lines that herded demonstrators and subjected demonstrators, including Plaintiffs, to
overwhelming force, and that the conspiracy was the proximate cause of the deprivation of Plaintiffs'
First Amendment rights. (*See id.* ¶¶ 167-169). Plaintiffs make the same allegations in Count Twenty-
Two, and assert that the Municipal Defendants' acts resulted in violations of the Fourth Amendment
rights of Plaintiffs and other demonstrators. (*See id.* ¶¶ 171-174).

These allegations are sufficient to state a claim under Rule 8(a). Plaintiffs allege an agreement
to violate constitutional rights, overt acts taken in furtherance of that agreement, and resulting
constitutional violations. Plaintiffs further allege that the unwritten agreement was entered into in the
course of the Municipal Defendants' meetings and planning in preparation for the FTAA. Plaintiffs

CASE NO. 06-21182-CIV-ALTONAGA/Turnoff

need not make more specific allegations to survive the motions to dismiss.

3.    *Necessity of Allegation of Underlying Constitutional Violation*

Defendants assert that Plaintiffs' conspiracy claims are deficient in that they fail to allege an underlying constitutional violation. *See GJR Invs. v. County of Escambia*, 132 F.3d 1359, 1370 (11th Cir. 1998) ("[T]o sustain a conspiracy action under § 1983, . . . a plaintiff must show an underlying actual denial of its constitutional rights."). Plaintiffs have alleged that the conspiracy between the Municipal Defendants proximately caused their deprivation of constitutional rights. (*TAC* ¶¶ 168, 173). In addition, as stated, Plaintiffs have sufficiently pleaded that they were actually deprived of their First Amendment and Fourth Amendment rights.     The undersigned therefore finds that Counts Twenty-One and Twenty-Two adequately state a claim for civil rights conspiracy in violation of 42 U.S.C. § 1983.

**F.    State Law Claims**

Counts Twenty-Three and Twenty-Four of the TAC assert common law tort claims against the Municipal Defendants, Count Twenty-Three for battery and Count Twenty-Four for negligence. Miami, Miami Beach, and Fort Lauderdale have moved to dismiss both of these counts. BSO has moved to dismiss only Count Twenty-Four.

Fort Lauderdale moves to dismiss Counts Twenty-Three and Twenty-Four on the basis that Plaintiffs failed to notify it in writing of the claims within three years of the claims' accrual, as required by the Florida sovereign immunity statute. *See* Fla. Stat. § 768.28(6)(a). Plaintiffs admit that they have failed to comply with the statute and that the three-year time limitation for notifying Fort Lauderdale of the claims has lapsed. Accordingly, Fort Lauderdale is entitled to dismissal of these counts.

21

Miami and Miami Beach move to dismiss Counts Twenty-Three and Twenty-Four on the basis that a municipality may not be held liable for actions taken by non-employees.  Because Plaintiffs have failed to identify the officers who inflicted their injuries, Defendants argue that the counts could be premised upon allegations that Miami and Miami Beach are liable for actions taken by officers employed by other law enforcement agencies.  (*See Miami Mot.* [D.E. 74] at 4-5). Plaintiffs respond that Florida's sovereign immunity statute provides that municipalities may be held liable for actions taken by "officer[s], employee[s], or agent[s,]" Fla. Stat. § 768.28(9)(a), and that even if identification of the officers who inflicted Plaintiffs' injuries reveals that those officers were not employees of the Defendants challenging these counts, all officers on the skirmish line were acting as agents of each of the law enforcement agencies involved in the joint operational security plan and the JLEC.  (*See Resp. to Miami Mot.* [D.E. 101] at 5-7).  Plaintiffs allege, in Count Twenty-Three and elsewhere, that "the Governmental Defendants entered into an agreement to act in concert during FTAA-related events in Miami."  (*TAC* ¶ 176).

Until Plaintiffs are able to identify the officers who inflicted their injuries, the Court is unable to determine whether those officers were employees or agents of particular Municipal Defendants. In addition, whether a particular officer is an agent of a municipality depends on the level of control the municipality exercises over the officer.  *See Stoll v. Noel*, 694 So.2d 701, 703 (Fla. 1997). Plaintiffs correctly point out that this is a highly fact-intensive inquiry that may not be determined at the motion to dismiss stage.  Therefore, Miami and Miami Beach are not entitled to dismissal of these counts on this basis.

Miami and Miami Beach have also asserted several arguments specific to each of Counts Twenty-Three and Twenty-Four.  The undersigned addresses those arguments in turn.

CASE NO. 06-21182-CIV-ALTONAGA/Turnoff

     1.    *Battery (Count Twenty-Three)*

Miami and Miami Beach challenge Count Twenty-Three on the basis that the acts of the law enforcement officers underlying the claim amount to conduct committed in bad faith or with malicious purpose such that the municipalities are insulated from liability under Florida's sovereign immunity statute. That statute provides that, while a municipality may ordinarily be held liable for the actions of its officers or agents, it

> shall not be liable in tort for the acts or omissions of an officer, employee, or agent committed while acting outside the course and scope of her or his employment or committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety or property.

Fla. Stat. § 768.28(9)(a).

Plaintiffs allege that "[t]he use of projectile weaponry and various chemical weapons constituted an intentional harmful or offensive contact with Plaintiffs, committed by Defendants' field force personnel within the course and scope of their employment with the respective Defendants." (*TAC* ¶ 177). Defendants point to paragraph 16 of the TAC, which is incorporated into Count Twenty-Three, and in which Plaintiffs additionally allege that "Lt. Yero [of the Miami Beach Police Department] is personally responsible for illegal practices engaged in by police officers . . . on November 20, 2003. . . ." Plaintiffs make similar allegations with respect to officers of the Miami Police Department. (*See id.* ¶¶ 13-15). Defendants assert that these allegations are tantamount to allegations of bad faith within the meaning of Fla. Stat. § 768.28(9)(a).

Plaintiffs assert that a scrivener's error resulted in the incorporation by reference of paragraphs 13 to 16 of the TAC into Count Twenty-Three and that they intended to incorporate only paragraphs 2 through 11. In any event, however, the allegation that particular officers are "personally

responsible for illegal practices" does not compel dismissal of this claim under Fla. Stat. § 768.28(9)(a).  The allegations in Count Twenty-Three are premised on Plaintiffs' contention that the Municipal Defendants should be held liable for the actions of the officers who inflicted Plaintiffs' injuries.  Those officers have not yet been identified, and Plaintiffs have not alleged that those officers acted in bad faith or with malicious purpose.

In addition, the allegation that Yero and the Miami Police Supervisors are liable for "illegal practices" is not equivalent to a claim that those officers acted in bad faith or with malicious purpose. It is possible for a law enforcement officer to commit an illegal act in the course of his or her employment while acting in good faith.  *See, e.g., Hennagan v. Dep't of Highway Safety and Motor Vehicles*, 467 So.2d 748, 751 (Fla. 1st DCA 1985) (reversing dismissal of battery claims against governmental entity for actions of officer during the course of arrest and stating, "it is not impossible to attribute the alleged actions of [the officer], at least in part, to misfeasance and/or overzealousness in the performance of his official duties").  Finally, municipalities may be held liable for the intentional torts of their employees or agents.  *See Richardson v. City of Pompano Beach*, 511 So.2d 1121, 1122 (Fla. 4th DCA 1987) (holding that allegation that officer committed an intentional tort was not equivalent to allegation that the officer acted with wanton and willful disregard for human rights, and stating that the exception for actions taken in bad faith or with malicious purpose "connotes conduct much more reprehensible and unacceptable than mere intentional conduct").

Plaintiffs do not allege that employees and/or alleged agents of Miami and Miami Beach acted in bad faith or with malicious purpose.  Therefore, Defendants are not entitled to dismissal of Count Twenty-Three based on Florida's sovereign immunity statute.

2.      *Negligence (Count Twenty-Four)*

Miami and Miami Beach assert that a negligence action may not be maintained against a law enforcement officer or the municipal employer of that officer unless the plaintiff establishes that a "special duty of care" existed between the plaintiff and the officer. (*See Miami Beach Mot.* [D.E. 93] at 9-11).  Miami and Miami Beach move to dismiss Count Twenty-Four on the basis that Plaintiffs have failed to allege that a special duty of care existed between Plaintiffs and the law enforcement officers present at the skirmish line.

Plaintiffs respond that law enforcement officers have a common law duty of care where they have created a "zone of risk," (*see Resp. to Miami Beach Mot.* [D.E. 115] at 5-7),[6] and that the allegations sufficiently state the existence of that zone of risk.  Count Twenty-Four alleges that "Defendants owed a duty to the Plaintiffs to exercise reasonable care by providing repeated audible warnings to disperse and allowing a reasonable time to disperse before discharging any weapons," and "Defendants owed a further duty to the Plaintiffs to exercise reasonable care in ensuring that only specific persons (if any) who had engaged in illegal conduct were subject to the use of force by projectiles and chemical weapons."  (*TAC* ¶ 181).

Defendants are correct that law enforcement officers generally have no common law duty of care to individuals.  *See Pollock v. Florida Dep't of Highway Patrol*, 882 So.2d 928, 935 (Fla. 2004) ("The responsibility to enforce the laws for the good of the public cannot engender a duty to act with care toward any one individual, unless an official assumes a special duty with regard to that person."); *Holodak v. Lockwood*, 726 So.2d 815, 816 (Fla. 4th DCA 1999) ("[P]laintiffs suing governmental

---

[6] Plaintiffs assert several other arguments that they contend support a finding that the law enforcement officers here owed a duty of care to the Plaintiffs.  Because the undersigned finds the "zone of risk" argument dispositive, the other arguments are not addressed.

CASE NO. 06-21182-CIV-ALTONAGA/Turnoff

entities for negligence [must] allege and prove that the defendant breached a common-law or statutory duty owed to the plaintiff individually and not a tort duty owed to the public generally.").

A special duty of care may arise, however, "when law enforcement officers become directly involved in circumstances which place people within a 'zone of risk' by creating or permitting dangers to exist. . . ." *Pollock*, 882 So.2d at 935. The Florida supreme court has noted that "[u]nder our case law, our courts have found liability or entertained suits after law enforcement officers took persons into custody, otherwise detained them, deprived them of liberty, or placed them in danger." *Kaisner v. Kolb*, 543 So.2d 732, 734 (Fla. 1989) (holding that law enforcement officers who pulled plaintiff over owed plaintiff a duty of care and that plaintiff was entitled to bring negligence suit against government agency after he was struck by a car during the stop); *see also City of Pinellas Park v. Brown*, 604 So.2d 1222, 1225 (Fla. 1992) (holding that law enforcement officers owed duty of care to people driving on highway during officers' high-speed chase); *Brown v. Miami-Dade County*, 837 So.2d 414, 417 (Fla. 3d DCA 2001) (holding that law enforcement officers owed duty of care to innocent bystanders during the course of a sting operation in a hotel); *City of Miami v. De La Cruz*, 784 So.2d 475, 478 (Fla. 3d DCA 2001) (affirming trial court's rejection of sovereign immunity defense where law enforcement officer collided with bystander during course of chase on foot).

Miami Beach asserts that no duty of care was created in this case because Plaintiffs were not "innocent bystanders" and because to accept Plaintiffs' argument would be to hold that "police presence in public under any circumstance could give rise to municipal liability as to persons for whom no special duty has been created." (*Miami Beach Reply* [D.E. 122] at 7 n.4). Whether or not the allegations establish Plaintiffs' status as that of innocent bystanders, the cases holding that law enforcement officers may assume a duty of care in special circumstances are not limited to instances

26

CASE NO. 06-21182-CIV-ALTONAGA/Turnoff

where the plaintiffs are innocent bystanders.  For example, in *Kaisner*, the court held that law enforcement officers owed a duty of care to the person they had pulled over for a traffic violation. *See* 543 So.2d at 734.[7]

Miami Beach's second assertion, that finding a duty of care in this case would impermissibly expand the "zone of risk" exception to cover all circumstances in which there is a police presence in public, finds no support in the allegations contained in the TAC and the videotape exhibit of the alleged events.  Police officers in full riot gear, heavily armed with less lethal weapons and chemical weapons, in a formation allegedly designed to limit the freedom of movement of demonstrators, can hardly be said to be the equivalent of an ordinary "police presence in public."  The risk to Plaintiffs in this case was exponentially higher than it would have been in an ordinary setting where police may be present.

The alleged conduct of law enforcement officers in forming the skirmish line and herding demonstrators engaged in constitutionally-protected expressive activity created a zone of risk to the demonstrators, including Plaintiffs, and to other people present in the area.  Thus, those law enforcement officers owed Plaintiffs a duty of care and Defendants are not entitled to dismissal of Count Twenty-Four on this basis.

### G.     Supervisory Liability Claims

In Counts Seven through Twenty of the TAC, Plaintiffs assert claims against the Individual Defendants, in their individual capacities, under 42 U.S.C. § 1983.  Counts Seven through Fourteen

---

[7] The *Kaisner* decision also makes clear that law enforcement officers owe a duty of care to persons placed in any sort of custody or detention.  *See* 543 So.2d at 734 (holding that the plaintiff's deprivation of liberty in the form of a traffic stop was sufficient to create a duty of care because the plaintiff was not free to leave at the time he was injured).

27

allege supervisory liability claims against specific Individual Defendants for directing unlawful acts in violation of the First and Fourth Amendments. Counts Fifteen through Twenty allege supervisory liability claims against specific Individual Defendants for failing to intervene to prevent violations of Plaintiffs' First and Fourth Amendment rights. These counts are divided into four categories: (1) directing unlawful acts in violation of the First Amendment; (2) directing unlawful acts in violation of the Fourth Amendment; (3) failing to intervene to prevent violations of the First Amendment; and (4) failing to intervene to prevent violations of the Fourth Amendment.

Defendants have asserted a number of arguments with respect to the sufficiency of these claims. Defendants also assert that they are entitled to dismissal of Plaintiffs' claims on the basis of qualified immunity. The undersigned addresses each of these four categories of claims in turn.

### 1.   *Standard for Supervisory Liability*

Government supervisors may be held liable for constitutional violations committed by their subordinates when either "the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation." *Braddy v. Florida Dep't of Labor & Empl. Sec.*, 133 F.3d 797, 802 (11th Cir. 1998) (quoting *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990)) (internal quotation marks omitted). A causal connection may be established by showing either that the supervisor "directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Dalrymple v. Reno*, 334 F.3d 991, 995 (11th Cir. 2003).

Claims under section 1983 against individuals who may assert qualified immunity as a defense are subject to a heightened pleading standard. *See id.* at 996. Unlike under the general notice pleading standard of Federal Rule of Civil Procedure 8(a), Plaintiffs must allege relevant facts "with

some specificity." *Id.* Alternatively stated, "more than mere conclusory notice pleading is required." *Id.* (internal citations omitted).

2.      *Standard for Qualified Immunity*

Each Individual Defendant asserts that the claims against him should be dismissed based on qualified immunity.  Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).[8]  To determine if an individual officer is immune from suit, the Court must determine: (1) whether the Plaintiffs' allegations, if true, establish a constitutional violation; and (2) whether the constitutional right at issue was "clearly established" at the time the Defendants acted.  *See Hope v. Pelzer*, 536 U.S. 730, 736, 739 (2002).

The Court has determined elsewhere in this Order that Plaintiffs' allegations, if true, establish constitutional violations.  The issue here, then, is whether the Individual Defendants' actions violated "clearly established" law.[9]  For the law to be "clearly established," it must be so clear that every objectively reasonable official understands it to prohibit the challenged act.  *See Vinyard v. Wilson*, 311 F.3d 1340, 1353 (11th Cir. 2002).  The purpose of this requirement is to "ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier v. Katz*, 533 U.S. 194, 206 (2001).

---

[8] Plaintiffs do not dispute that each of the Individual Defendants is a government official who was performing discretionary functions at the time of the conduct at issue in this case.

[9] In this Circuit, decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the Supreme Court of Florida clearly establish the law.  *See Marsh v. Butler County*, 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (en banc).

That the very act (or something materially similar to it) in question has previously been held unlawful by a court is not always necessary.  But in light of preexisting law, the unlawfulness must be apparent: plain, clear, obvious.  Unless the government official's act is so obviously wrong, in the light of preexisting law, that only a plainly incompetent official or one who was knowingly violating the law would have committed the act, the official is entitled to qualified immunity.

*Snider v. Jefferson State Community College*, 344 F.3d 1325, 1328 (11th Cir. 2003).

A plaintiff may demonstrate that the law was "clearly established" with respect to a particular activity in one of three ways.  First, a plaintiff may show that the circumstances surrounding the violation of his or her rights are substantially similar to the factual situation in a previous case.  *See Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Second, a plaintiff may demonstrate "that a broader, clearly established principle should control the novel facts in [his or her] situation." *Id.* (citing *Hope*, 536 U.S. at 741).  Finally, a plaintiff may show that an official's conduct so obviously violated the Constitution that the non-existence of prior law on point is unnecessary.  *See id.* (citing *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002)).

Whether the law was clearly established with respect to the claims set forth in the TAC is addressed separately below with respect to each claim.

### 3.   *Directing Unlawful Acts*

#### a.   Sufficiency of Pleading

Counts Seven through Fourteen allege that Timoney, Fernandez, Cannon, Yero, Spector, and Brooks directed their respective subordinates to take actions that resulted in the violation of Plaintiffs' First and Fourth Amendment rights.  The Individual Defendants challenge these claims on the bases that they have not been sufficiently pleaded because they do not identify the specific officers

who caused Plaintiffs' injuries and because they do not sufficiently set forth the specific acts taken by the Individual Defendants to cause Plaintiffs' injuries.[10]

Plaintiffs allege with respect to the Individual Defendants that the actions of the police during the FTAA protests, which constituted "unconstitutional acts including herding, encirclement and excessive force, were planned and condoned by the Joint Law Enforcement Command." (*TAC* ¶ 44). The additional specific allegations as to each of the Individual Defendants are as follows:

Plaintiffs allege that Timoney, "the official decisionmaker regarding the City of Miami's FTAA law enforcement operation" and the Chief of the Miami Police Department, was within 100 feet of the rear of the skirmish line that allegedly assaulted and herded Plaintiffs. (*Id.* ¶¶ 80-81, 86-87). According to the TAC, Timoney had approved orders given by Fernandez and Cannon instructing the officers in the skirmish line to continue marching northward while assaulting and herding protestors. (*See id.* ¶¶ 82, 88). Timoney's approval of Fernandez and Cannon's orders, Plaintiffs allege, was the proximate cause of Plaintiffs' deprivation of rights. (*See id.* ¶¶ 83, 89).

Plaintiffs allege that Fernandez, the Deputy Chief of the Miami Police Department, "made the decision to utilize 'herding techniques' to corral the demonstrators . . . by personally directing the police lines to march northward and disrupt the lawful assembly," proximately causing the violation of Plaintiffs' rights. (*Id.* ¶¶ 92, 94, 97, 99) (emphasis omitted).

Plaintiffs allege that Cannon, a captain in the Miami Police Department, "was an integral part of the planning for the FTAA, including planning the security of the ministerial meetings, the planning

---

[10] Defendants argue both that Plaintiffs have failed to identify the specific officers who inflicted their injuries and that Plaintiffs have failed to allege that the actions of any specific Individual Defendant led to the injuries sustained by the Plaintiffs. Both of these arguments have been analyzed (and rejected) separately in this Order. The undersigned does not address them again here.

of the demonstration sites and the police mobilization." (*Id.* ¶¶ 102, 108). Plaintiffs further allege that Cannon "personally gave the order [to the police skirmish line] to begin discharging weapons at the unarmed demonstrators," proximately causing the violation of Plaintiffs' rights. (*Id.* ¶¶ 103, 105, 109, 111).

Plaintiffs allege that <u>Yero</u>, an official decisionmaker for the City of Miami Beach Police Department's forces provided for the FTAA, "gave the order to shoot and spray unarmed demonstrators near Biscayne Boulevard at approximately 3:30 p.m. on November 20, 2003." (*Id.* ¶¶ 114, 121). Plaintiffs further allege that Yero was "on or directly behind the police skirmish line . . . and directed [his] platoon[] to follow the orders of Fernandez and Cannon to march northward and discharge weapons at the unarmed demonstrators, including the plaintiffs[,]" proximately causing the violation of Plaintiffs' rights. (*Id.* ¶¶ 117-118, 124-125).

Plaintiffs allege that <u>Brooks</u>, the commander of the BSO field force provided for the FTAA, was "an official decisionmaker . . . responsible for the movement of [law enforcement officers] under his command and the discharge of weapons." (*Id.* ¶¶ 115, 122). Plaintiffs further allege that Brooks was "on or directly behind the police skirmish line . . . and directed [his] platoon[] to follow the orders of Fernandez and Cannon to march northward and discharge weapons at the unarmed demonstrators, including the plaintiffs[,]" proximately causing the violation of Plaintiffs' rights. (*Id.* ¶¶ 117-118, 124-125).

Plaintiffs allege that <u>Spector</u>, the commander of the Fort Lauderdale Police Department's forces provided for the FTAA, was "an official decisionmaker . . . responsible for the movement of [law enforcement officers] under his command and the discharge of weapons." (*Id.* ¶¶ 116, 123). Plaintiffs further allege that Spector was "on or directly behind the police skirmish line . . . and

directed [his] platoon[] to follow the orders of Fernandez and Cannon to march northward and discharge weapons at the unarmed demonstrators, including the plaintiffs[,]" proximately causing the violation of Plaintiffs' rights.  (*Id.* ¶¶ 117-118, 124-125).

These allegations establish that each Individual Defendant specifically ordered the conduct that proximately caused the alleged violations of Plaintiffs' constitutional rights.  In addition, Plaintiffs allege that each Individual Defendant was located in the proximity of the skirmish line when the alleged constitutional violations occurred.  The undersigned, mindful of the applicable heightened pleading requirement, finds that the allegations against each of the Individual Defendants are sufficient to state claims for direction of unlawful acts resulting in the violation of Plaintiffs' First and Fourth Amendment rights.[11]

> b.   Qualified Immunity

> (1) Alleged First Amendment Violations

In Counts Seven, Nine, Eleven, and Thirteen of the TAC, Plaintiffs allege that specific Individual Defendants directed the use of the police skirmish line to suppress protest of the FTAA meetings, resulting in violations of Plaintiffs' First Amendment rights.  The Individual Defendants are entitled to qualified immunity unless their actions violated clearly established federal law.

Under the First Amendment, "Congress shall make no law . . . abridging the freedom of speech . . . ."  U.S. Const. amend. I.  It is well-established that peaceful protest is an expressive activity that constitutes protected "speech" under the First Amendment.  *See United States v. Grace*,

---

[11] As discussed elsewhere in this Order, Plaintiffs are unable, at this juncture, to identify the specific officers who caused their alleged injuries.  Should Defendants discover that the instructions given by a particular Individual Defendant did not, in fact, directly result in the violation of either Rauen's or Hartman's rights, that argument may be addressed at the summary judgment stage.

CASE NO. 06-21182-CIV-ALTONAGA/Turnoff

461 U.S. 171, 176 (1983).

> "[P]ublic places" historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be "public forums" [and] [i]n such places, the government's ability to permissibly restrict expressive conduct is very limited: the government may enforce reasonable time, place, and manner regulations as long as the restrictions are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. . . . Additional restrictions such as an absolute prohibition on a particular type of expression will be upheld only if narrowly drawn to accomplish a compelling government interest.

*Id.* at 177 (internal quotation marks and citations omitted).

In this case, Plaintiffs allege that they were peacefully protesting, Rauen on the grass near the Bayfront Amphitheater and Hartman on the east side of Biscayne Boulevard, when they were confronted by the skirmish line, struck with less lethal weapons, and forced to discontinue their protest. (*See TAC* ¶¶ 6-7, 33-36, 43). Plaintiffs allege that the Individual Defendants directed the unlawful activity of the skirmish line officers in order to suppress constitutionally-protected expressive activity. (*See, e.g., id.* ¶ 35). Taking Plaintiffs' allegations as true, clearly established federal law, at the time of the FTAA protests, made clear that the government's activity in suppressing peaceful protest in a public forum, in the absence of a compelling government interest in doing so,[12] was a violation of Plaintiffs' First Amendment rights.

Defendants frame the issue as whether it was clearly established that it was "unconstitutional to use less-than-lethal weapons to disperse a crowd at a large public demonstration." (*BSO Mot.* at 13). Framing the issue in this manner does not compel a different result. First, the fact that less lethal weapons were used is irrelevant in the First Amendment context. Plaintiffs allege that Defendants

---

[12] Defendants have not argued that there was a compelling government interest in suppressing the protest of the FTAA meetings. Instead, they simply assert that suppression of protest in the course of dispersing a large crowd of people is not a clear violation of the First Amendment. (*See, e.g., BSO Mot.* at 13-15).

34

infringed their First Amendment rights by forcing them to discontinue expressing themselves *via* peaceful protest.  The method by which Defendants allegedly did this is irrelevant.

Second, the text of the First Amendment does not contain an exception for large gatherings of people.  *See Bourgeois v. Peters*, 387 F.3d 1303, 1311 (11th Cir. 2004) (making identical observation with respect to Fourth Amendment in holding that requiring magnetometer search of all protestors at large demonstration without individualized suspicion violated the Constitution). Defendants had no rational reason to believe that they were entitled to violate the First Amendment's protections simply because many protestors, as opposed to one or a few, were present.[13]  The fact that Defendants acted in the context of a large demonstration does not alter the clearly established law set forth above.  Defendants were aware, or should have been aware, that Plaintiffs were entitled to exercise their right to peacefully protest in the absence of a compelling government interest in quashing their protest.  The mere fact that a large number of people are gathered does not constitute a "compelling government interest" in limiting the First Amendment rights of the people present at the protest; to hold otherwise would be to eviscerate the First Amendment's protections.

Because it was clearly established that Defendants could not constitutionally suppress the peaceful protests of Plaintiffs and others in a public forum in the absence of a compelling government interest, and because Defendants have not argued that such an interest existed, the undersigned finds that the Individual Defendants are not entitled to qualified immunity on Counts Seven, Nine, Eleven, and Thirteen of the TAC.

---

[13] Defendants have not asserted in the Motions that the allegedly unconstitutional ordinance passed by Miami prior to the FTAA meetings should impact the qualified immunity analysis, and consequently the Court has not considered the effect, if any, that the ordinance would have on this analysis. *See, e.g., Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979) ("Police are charged to enforce laws until and unless they are declared unconstitutional.").

Brooks also argues, and other Individual Defendants incorporate his argument by reference, that because he was following the orders of his superior officers, he is entitled to qualified immunity unless Plaintiffs can establish that a reasonable officer in Brooks' position would have had fair notice that his carrying out of orders given by high-ranking Miami police officers would violate clearly established federal law. (*See BSO Mot.* at 16). Officers following the orders of their superiors are entitled to qualified immunity unless they "acted unreasonably in following [their superior's] lead, or . . . they knew or should have known that their conduct might result in a violation of the plaintiff's rights." *Hartsfield v. LeMacks*, 50 F.3d 950, 956 (11th Cir. 1995). Qualified immunity has been afforded to officers following superiors' orders where, for example, an officer is ordered to search a person previously questioned by the officer's superior (such that the officer reasonably believes that there is individualized suspicion supporting the search). *See Brent v. Ashley*, 247 F.3d 1294, 1306 (11th Cir. 2001).

This case is not a case of that type. The Individual Defendants asserting this argument here had no reason to believe that an order from high-ranking Miami police officers to suppress legal protest on a wholesale basis with allegedly no justification would not result in a violation of clearly established federal law. Thus, the Individual Defendants who have asserted this argument are not entitled to qualified immunity on the basis that they were following orders.

### (2) Alleged Fourth Amendment Violations

In Counts Eight, Ten, Twelve, and Fourteen of the TAC, Plaintiffs allege that specific Individual Defendants directed the police skirmish line to "herd" protestors using less lethal weapons, and that those actions resulted in the unreasonable seizure of Plaintiffs, and the use of excessive force against Plaintiffs during the course of that seizure, in violation of the Fourth Amendment. The

CASE NO. 06-21182-CIV-ALTONAGA/Turnoff

Individual Defendants are entitled to qualified immunity unless their actions violated clearly established federal law.

As discussed elsewhere in this Order, Defendants argued that the conduct of officers in "herding" the Plaintiffs did not constitute a seizure within the meaning of the Fourth Amendment. The undersigned has resolved this issue in favor of Plaintiffs, finding that the allegations support a claim that the officers' conduct did, in fact, result in a seizure. Nevertheless, the discussion of that issue, and the competing case law on that issue, demonstrates that the actions of the officers, and thus, the Individual Defendants' directing of those actions, did not violate "clearly established" federal law. In addition, because it was not clear at the time of the officers' actions that those actions would result in a seizure of Plaintiffs, it cannot be said that it was clearly established that the use of force, even excessive force, in herding the Plaintiffs would result in a violation of the Fourth Amendment, which is only implicated where there is, in fact, a seizure. Each of the Individual Defendants is thus entitled to qualified immunity with respect to Counts Eight, Ten, Twelve, and Fourteen of the TAC.

4.    *Failure to Intervene*

a.    <u>Failure to Intervene to Prevent Violations of First Amendment</u>

Defendants assert that causes of action for failure to intervene to prevent violations of constitutional rights are only available in cases of excessive force. (*See BSO Mot.* at 17-18). Thus, while admitting that a cause of action may lie in some circumstances for failure to intervene to prevent violations of the Fourth Amendment, Defendants assert that no such cause of action exists with respect to the First Amendment and, therefore, that Counts Fifteen, Seventeen, and Nineteen of the TAC should be dismissed. In support of their argument, Defendants point to the lack of case law on this point.

37

Plaintiffs assert that cases recognizing a cause of action for failure to intervene to prevent unconstitutional use of force do not limit their terms to cases of excessive force and that the logic set forth in those cases would apply equally to a claim for failure to intervene to prevent First Amendment violations. (*See Resp. to BSO Mot.* at 23-24). The undersigned need not decide this issue because the dearth of case law on this issue, and the lack of any U.S. Supreme Court, Eleventh Circuit, or Florida Supreme Court case finding liability for failure to intervene to prevent violations of the First Amendment, evidence a lack of clearly established law that entitles each Individual Defendant to qualified immunity with respect to Counts Fifteen, Seventeen, and Nineteen of the TAC.

b.      Failure to Intervene to Prevent Violations of Fourth Amendment

In Counts Sixteen, Eighteen, and Twenty of the TAC, Plaintiffs allege that Timoney, Fernandez, Cannon, Yero, Spector, Brooks, and Burden failed to intervene to prevent violations of Plaintiffs' Fourth Amendment rights. Plaintiffs base these claims on their allegations that each of the Individual Defendants was present at the skirmish line, personally witnessed the conduct that resulted in the alleged violations of Plaintiffs' Fourth Amendment rights, and failed to intervene to prevent the constitutional violations. (*See TAC* ¶¶ 129, 130-131, 135-137, 142-143, 148-149, 155-156, 162-163).

While the parties agree that a cause of action for failure to intervene to prevent Fourth Amendment violations does exist, the Individual Defendants are entitled to qualified immunity on these claims because, again, the law was not clearly established that the officers' conduct in herding the Plaintiffs and using force against them implicated the Fourth Amendment. In other words, at the time that the skirmish line was allegedly herding the Plaintiffs, the Individual Defendants were not aware that any seizure was occurring and, thus, were not aware that the Fourth Amendment was

38

CASE NO. 06-21182-CIV-ALTONAGA/Turnoff

(allegedly) being violated.  It cannot be said, therefore, that the law was "clearly established" that the Individual Defendants' failure to intervene to prevent the officers' actions would result in a violation of Plaintiffs' Fourth Amendment rights.  Each of the Individual Defendants is entitled to qualified immunity with respect to Counts Sixteen, Eighteen, and Twenty of the TAC.

### III.   CONCLUSION

Based on the foregoing, it is **ORDERED AND ADJUDGED** as follows:

1.      Defendants, Broward Sheriff's Office and John Brooks' Motion to Dismiss Third Amended Complaint **[D.E. 60]** is **GRANTED-IN-PART** and **DENIED-IN-PART** in accordance with the above.

2.      Defendant, City of Miami's Motion to Dismiss Third Amended Complaint **[D.E. 74]** is **DENIED.**

3.      Defendants, John Timoney, Frank Fernandez, Adam Burden, and Thomas Cannon's Motion to Dismiss Third Amended Complaint **[D.E. 75-76]** is **GRANTED-IN-PART** and **DENIED-IN-PART** in accordance with the above.

4.      Defendants, City of Fort Lauderdale and Lee Spector's Motion to Dismiss Plaintiffs' Third Amended Complaint **[D.E. 80]** is **GRANTED-IN-PART** and **DENIED-IN-PART** in accordance with the above.

5.      Defendant, City of Miami Beach's Motion to Dismiss Plaintiffs' Third Amended Complaint **[D.E. 93]** is **DENIED**.

6.      Defendant, Ed Yero's Motion to Dismiss Plaintiffs' Third Amended Complaint **[D.E. 94]** is **GRANTED-IN-PART** and **DENIED-IN-PART** in accordance with the above.

CASE NO. 06-21182-CIV-ALTONAGA/Turnoff

7.      Counts Eight, Ten, Twelve, Fourteen, Fifteen, Sixteen, Seventeen, Eighteen, Nineteen, and Twenty of the TAC are **DISMISSED** against all Defendants.

8.      Counts Twenty-Three and Twenty-Four of the TAC are **DISMISSED** with respect to Fort Lauderdale only.

**DONE AND ORDERED** in Chambers at Miami, Florida this 2nd day of March, 2007.


_____

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**


Copies provided to:
(1) Magistrate Judge William C. Turnoff
(2) Counsel of record